| OHIO VALLEY ENERGY SYSTEMS | : CIVIL ACTION |
|---|---|
| CORPORATION | : |
| | : |
| v. | : NO. 15-29 |
| | : |
| DL RESOURCES, INC. | : |

**KEARNEY, J.** December 5, 2016

# AMENDED MEMORANDUM[1]

After years of working together in owning and operating natural gas and oil wells, two contracting parties are now disputing multiple aspects of their relationship. It is hard to discern why they are fighting, but we are left with the debris of largely fact based disputes over money requiring credibility findings. After working through a menu of disputes, we can pick out a couple which can be resolved as a matter of law. Their business relationship should be resolved by experienced and prudent businesspersons recognizing the time value of revenue balanced against increasing trial costs resulting in a fact finder not trained in their specialized business defining their responsibilities. We are not there as yet and, in the accompanying Order, grant in part and deny in part the cross-motions for summary judgment.

## I.    Undisputed facts

DL Resources develops and operates oil and gas interests operating 695 natural gas and oil wells.[2] Ohio Valley Energy Systems Corporation shares a working ownership interest in 233 of these Western Pennsylvania wells.[3]

On November 2, 2000, the parties signed a Letter of Mutual Agreement establishing an "Area of Mutual Interest" for developing and producing oil and natural gas in McKean and

Warren Counties.[4] In December 2000, DL and Ohio Valley signed a drilling and operating agreement ("December 2000 Agreement").[5] On May 17, 2001, DL and Ohio Valley signed eight Form 610 model Form Operating Agreements ("May 2001 Agreements").[6] Most of the remaining facts material to the present issues are disputed.

## II. Disputed Issues

### *The Warrant 4912 dispute*

The parties' first dispute is whether the December 2000 Agreement or the May 2001 Agreement governs their obligations relating to a well group called Warrant 4912. Ohio Valley contends their obligations on Warrant 4912 are governed by the December 2000 Agreement, while DL claims their obligations are governed by one of the eight May 2001 Agreements.[7]

The December 2000 Agreement is missing exhibits defining the relevant contract area. It provides DL, under an "oil and gas deed" attached as Exhibit A, "has certain rights to develop wells and well locations identified on the map," attached as Exhibit B.[8] These exhibits are not attached to the December 2000 Agreement, and the parties have not provided these exhibits.[9] Although the December 2000 Agreement fails to define a contract area, it contains an integration clause: "This Agreement, including the Exhibits hereto, constitutes and represents the entire understanding and agreement of the parties with respect to the subject matter hereof."[10]

The May 2001 Agreement defines the contract area as "all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit A."[11] Exhibit A provides "[t]he lands subject to this Agreement are set forth on Exhibit A-2."[12] Exhibit A-2 defines the relevant contract area broadly as the

2

premises situated within Warrant 4912 and other areas, with some specified exceptions not relevant here:

> *This interest covers the premises situated in Warrant 4912*, Hilton Township, McKean County, Pennsylvania containing 1127 acres more or less, bounded substantially as follows:
>
> Now or formerly:
> On the North by lands of Warrant 4911
> On the South by lands of Warrant 4913
> On the East by lands of Warrant 3412
> On the West by lands of Warrant 5572 and Warrant 5556
>
> The following existing wells: 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 . . . and a five acre square with each well at the center of the square.
>
> Warrant 4912 less and except that 120 acres contained within the northwest corner . . . and that acreage contained within a ten (10) acre square surrounding one well drilled by Minard Run Oil Company (Minard Run) on a portion of 4912.[13]

Despite this specific language, Ohio Valley claims the May 2001 Agreements only apply to ten wells Ohio Valley acquired from Whidbey Resources.[14]

### *Disputes on books and records*

The parties also dispute production of information. Both the December 2000 Agreement and the May 2001 Agreement contain identical obligations of access to the Operator's books and records: "Each party . . . shall have access at reasonable times to information pertaining to the development or operation [of the wells], including Operator's books and records relating thereto."[15]  Both agreements require the Operator, DL, to furnish certain information upon request: "Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month."[16]

### *Fee disputes.*

Both the December 2000 Agreement and the May 2001 Agreements require Ohio Valley pay DL operating/overhead fees. Under the December 2000 Agreement, Ohio Valley must pay DL an operating fee of $150 "in lieu of any direct charges by [DL] for its services or the provisions by [DL] of its equipment required for normal superintendence and maintenance of wells."[17] The operating fee covers "all normal, regularly recurring operating expenses for the production and sale of natural gas, including, without limitation, well-tending, routine maintenance and adjustment, reading meters, recording production, pumping, maintaining appropriate books and records, preparing reports to the Interest Holders and government agencies, and collecting and disbursing revenues."[18]

Under the May 2001 Agreements, Ohio Valley must pay DL $250 per well per month in "overhead."[19] DL may also charge Ohio Valley for a number of "direct charges."[20] These direct charges are organized into fifteen categories: (1) ecological and environmental; (2) rentals and royalties; (3) labor; (4) employee benefits; (5) material; (6) transportation; (7) services; (8) equipment and facilities furnished by operator; (9) damages and losses to joint property; (10) legal expense; (11) taxes; (12) insurance; (13) abandonment and reclamation; (14) communications; and (15) other expenditures.[21]

### *Removal of an operator and right to partition.*

The parties also dispute whether their Agreement allows removal of an operator. The May 2001 Agreements contain stricken language, and the parties dispute whether they agreed to this stricken language.[22] The stricken language includes involuntary removal of an operator and granting the right to partition the wells. Ohio Valley argues DL presented Ohio Valley President David Matak with only the signature pages of the May 2001 Agreements, which he signed.[23]

4

Ohio Valley President Charles Masters argues the parties had a practice of initialing changes within a written agreement.[24]   DL disputes whether the parties had such a practice.[25]

### *DL's limited liability.*

The May 2001 Agreements limits liability of the operator, DL: "shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct."[26]

### *Billing disputes.*

The May 2001 Agreements limit Ohio Valley's time for challenging a billed charge or expense where the non-operator fails to lodge a written objection:

> [A]ll bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.[27]

### *Right to partition of the Southern Wells.*

DL and Ohio Valley also share an interest in a group of wells they call the "Southern Wells," or the Ferringer, Stiver, Musser, and Catfish #2 wells.[28]  The parties agree these wells are governed by the December 2000 Agreement even though the December 2000 Agreement does not contain a contract area.[29]  The December 2000 Agreement grants DL and Ohio Valley the right to partition the wells, but only after the parties attempt to negotiate terminating the agreement in good faith.[30]

### III.   Analysis

On January 20, 2015, Ohio Valley sued DL for partition, breach of contract, breach of covenant of good faith and fair dealing, and injunctive relief with respect to a Well Group located

5

in McKean County, known as Warrant 4912.[31] On February 17, 2015, Ohio Valley filed its First Amended Complaint, asserting the same claims but adding an additional 10 wells located within Warrant 4912.[32] On March 10, 2015, DL filed an answer to Ohio Valley's First Amended Complaint, which included a counterclaim based upon Ohio Valley's alleged failure to pay DL its pro rata share of direct expenses and overhead charges under the parties' agreements.[33]

On May 10, 2016, Ohio Valley filed a Second Amended Complaint, asserting nine claims: (1) partition of Warrant 4912; (2) partition of the Southern Wells; (3) breach of the December 2000 Agreement for failing to provide documentation, failing to operate the wells in a good and workmanlike manner, and overcharging for gas and fuel; (4) breach of the May 2001 Agreements for failing to provide documentation, failing to operate the wells in a good and workmanlike manner, and overcharging for gas and fuel; (5) partition of the wells governed by the May 2001 Agreements; (6) breach of the covenant of good faith and fair dealing; (7) injunctive relief in the form of removing DL as operator; (8) unjust enrichment for gas usage and fuel surcharges; and (9) unjust enrichment for overcharging monthly fees.[34] On June 1, 2016, DL filed an Answer to the Second Amended Complaint and reasserted its counterclaim against Ohio Valley.[35]

Both Ohio Valley and DL moved for summary judgment.[36] The parties agree the December 2000 Agreement applies to the Southern Wells, but they dispute whether the December 2000 Agreement or the May 2001 Agreements applies to the remaining wells.

We need a list to keep track of the variety of disputes and our holdings:

\* DL cannot claim breach of the December 2000 Agreement or request a partition because it failed to provide evidence of the contract area. We accordingly grant DL's motion for

6

summary judgment on Count I (partition of Warrant 4912) and deny Ohio Valley's motion for summary judgment on Count I. Count I is dismissed;

\*      A genuine dispute of fact exists as to whether Ohio Valley is entitled to a partition of the Southern Wells. We deny both parties' motions for summary judgment as to Count II (partition of the Southern Wells);

\*      Ohio Valley is bound by the stricken language in the May 2001 Agreements— even though Ohio Valley President David Matak admits he only signed the signature pages— because Ohio Valley fails to adduce evidence of fraud. Because the stricken language granted Ohio Valley the right to partition and the right to remove the operator under the May 2001 Agreements, we grant DL's motion for summary judgment as to Count V (partition of wells governed by the May 2001 Agreements) and Count VII (injunctive relief) and deny Ohio Valley's motion for summary judgment as to Count V. Counts V and VII are dismissed.

\*      The May 2001 Agreement applies to Warrant 4912 based on its express terms. We deny Ohio Valley's motion for summary judgment as to Count III (breach of the December 2000 Agreement) to the extent it seeks relief for breach of contract as to Warrant 4912 under the December 2000 Agreement.

\*      Ohio Valley does not have the right to a partition of the leased wells or the leased well assets. Although we already determined Ohio Valley does not have the right to partition under the May 2001 Agreements and denied its motion for summary judgment as to Count V, we also deny Ohio Valley's motion for summary judgment as to Count V (partition of wells based on the May 2001 Agreements) to the extent it relies on the May 2001 Agreements to partition the leased wells.

7

\*         DL breached the December 2000 Agreement as to the Southern Wells by charging for gas and fuel above the administrative fee. We grant in part Ohio Valley's motion for summary judgment as to Count III (breach of the December 2000 Agreement) to the extent it seeks to enforce the December 2000 Agreement as to the Southern Wells. We deny Ohio Valley's motion as to Count IV (breach of the May 2001 Agreements) to the extent it claims breach of the May 2001 Agreements for overcharging for gas and fuel. We grant in part DL's motion for summary judgment as to Count IV to the extent Ohio Valley claims breach of the May 2001 Agreements for overcharging for gas and fuel;

\*         We grant DL's motion for summary judgment as to Counts VIII and IX—unjust enrichment claims—because an express contract exists. We deny Ohio Valley's motion as to Count VIII. Ohio Valley's unjust enrichment claims under Counts VIII and IX are dismissed;

\*         A genuine dispute of material fact exists as to whether DL breached the December 2000 Agreement (as to the Southern Wells) or the May 2001 Agreements (as to the remaining wells) for failing to provide requested documentation. We deny both parties' motions for summary judgment under Count III (breach of the December 2000 Agreement) and Count IV (breach of the May 2001 Agreements) to the extent Ohio Valley claims DL breached these agreements for failing to provide documentation;

\*         The requirement of gross negligence or willful misconduct only applies to whether DL conducted its operations in a good and workmanlike manner. We deny DL's motion for summary judgment on all claims to the extent DL claims Ohio Valley failed to provide evidence DL engaged in gross negligence or willful misconduct;

8

\*         We grant DL's motion for summary judgment as to Count VI (breach of covenant of good faith) because this claim cannot be pled as an independent claim. Ohio Valley's breach of covenant of good faith claim under Count VI is dismissed; and,

\*         We find a genuine dispute of material fact as to whether Ohio Valley timely objected to charges or expenses. We deny DL's motion for summary judgment as to all claims to the extent it claims Ohio Valley is not entitled to damages beyond the two-year contractual limitation.

### 1. Ohio Valley cannot base a breach of contract claim on the December 2000 Agreement except as to the Southern Wells.

To the extent Ohio Valley premises its claims on the December 2000 Agreement, these claims fail—except as to claims pertaining to the Southern Wells—because Ohio Valley cannot demonstrate the area governed by the December 2000 Agreement. "A party claiming breach of contract must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.'"[37] December 2000 Agreement contains an integration clause. Nevertheless, Ohio Valley failed to provide essential terms of the December 2000 Agreement—the contract area it governs. The December 2000 Agreement refers to a deed and a map attached as exhibits, but the parties did not produce these exhibits during discovery. As Ohio Valley failed to establish an essential term of the December 2000 Agreement, it cannot establish DL breached the December 2000 Agreement. We deny Ohio Valley's motion for summary judgment as to Counts I (partition) as it is premised on enforcing the December 2000 Agreement, and we grant DL's motion for summary judgment as to Count I.

Despite the lack of a defined contract area in the December 2000 Agreement, the parties agree the December 2000 Agreement governs the Southern Wells.

9

### 2. We deny summary judgment as to a partition of the Southern Wells.

Ohio Valley contends it is entitled to a partition of the Southern Wells under the December 2000 Agreement because it fulfilled its contractual obligations to negotiate termination of the agreement in good faith. DL disputes whether the parties negotiated in good faith.

There is a genuine dispute of material fact as to whether the parties negotiated in good faith. DL president David Bonacci swears Ohio Valley never contacted him in an effort to negotiate terminating the December 2000 Agreement.[38] Ohio Valley president Charles Masters swears Ohio Valley made a good faith effort to resolve outstanding claims and issues between Ohio Valley and DL.[39] This conflicting testimony creates a genuine issue of material fact for trial. We deny both parties' motions for summary judgment as to Count II (partition of Southern Wells).

### 3. Ohio Valley is bound by the stricken language in the May 2001 Agreements.

Ohio Valley contends it is not bound by the stricken language in the May 2001 Agreements despite former Ohio Valley President David Matak's admission he signed the signature pages of these agreements. We find Ohio Valley bound by the stricken language in the May 2001 Agreements.

In Pennsylvania, "a contract is created where there is mutual assent to the terms of a contract by the parties with the capacity to contract."[40] "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter."[41]  "[A] party's signature to a contract is designed to evidence his or her intention to be bound thereby."[42]  "The requirement of

consideration as an essential element of a contract is nothing more than a requirement that there be a bargained for exchange."[43]

"It is well established that, in the absence of fraud, the failure to read a contract before signing it is 'an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract'; it is considered 'supine negligence.'"[44] Where a party signs a document without alleging fraud, producing evidence "to show a lack of capacity to understand the document signed," and asking "for an explanation of the contract language," the party "must be held to the contract's terms."[45] "[A] party alleging fraud has the burden of proving the same by clear and convincing evidence."[46]

Ohio Valley contends DL presented former Ohio Valley President David Matak only the signature pages of the May 2001 Agreements, yet he signed them anyway.[47] His signatures constitute objective manifestations of assent to the May 2001 Agreements, including the stricken language. The requirement of consideration is satisfied because both parties incurred legal obligations under the agreements.

Ohio Valley fails to adduce clear and convincing evidence of fraud. Ohio Valley President Charles Masters speculates to the "possibility" of fraud.[48] He states "the signature pages may have been attached to something we did not see or approve," but he admits he has no evidence of fraud.[49] As Ohio Valley fails to satisfy its burden of demonstrating fraud by clear and convincing evidence, it is bound to the May 2001 Agreement, including its stricken terms.

Ohio Valley President Charles Masters contends the parties did not agree to the stricken language because the parties had a practice of initialing changes to written agreements.[50] DL disputes whether the parties had such a practice.[51] Regardless of whether the parties had such a practice, Ohio Valley is bound by President Matak's signature to the May 2001 Agreement

11

because the signature constitutes Ohio Valley's objective manifestation of assent to the May 2001 Agreement.

Because Ohio Valley is bound by the stricken terms, we deny Ohio Valley's motion for summary judgment as to Count V (partition), and grant DL's motion with respect to Count V, because the May 2001 Agreement—with the stricken terms—does not provide the right to partition. We also grant DL's motion for summary judgment as to Count VII (injunctive relief) because the May 2001 Agreement with the stricken terms does not permit involuntary removal.

### 4. The May 2001 Agreement applies to Warrant 4912.

Ohio Valley claims the May 2001 Agreements only apply to ten wells Ohio Valley acquired from Whidbey Resources, and they do not apply to Warrant 4912. Ohio Valley's only support for this assertion is Ohio Valley President Masters' bald allegation the May 2001 Agreements only apply to the Whidbey wells. Ohio Valley does not rely on the language of the May 2001 Agreements themselves. The May 2001 Agreement defines the contract area as "the premises situated in Warrant 4912," with some exceptions not relevant here.[52] Based on this language, the May 2001 Agreement clearly applies to Warrant 4912.

### 5. Partition of the leased wells and their assets.

Ohio Valley contends the May 2001 Agreements have expired under their own terms to the extent the oil and gas leases for these wells have terminated because the wells are no longer producing. Ohio Valley argues because the May 2001 Agreements have expired, it is entitled to a partition of these wells and their assets. DL contends the wells are now producing, and the lessors either consented to any shut-in of the wells of DL resumed production for a period sufficient to preserve the leases. DL also contends the parties' interest in the leases or in the assets cannot be partitioned.

12

Article XIII of the May 2001 Agreements provides, "This agreement shall remain in full force and effect as to the oil and gas leases and/or oil and gas interests . . . . [s]o long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal, or otherwise."[53]

Ohio Valley provided three leases. These leases generally provide the lease terminates if the well fails to produce in paying quantities for a specified period of time.[54] While Ohio Valley contends some wells have failed to produce in paying quantities, DL contends the wells were shut in with consent of the lessors.[55] This raises a genuine factual dispute as to whether the leases have terminated.

Nevertheless, even if the leases have terminated, Ohio Valley is not entitled to a partition. "Partition is a possessory action; its purpose and effect being to give each of a number of joint owners the possession he is entitled to or his share in severalty."[56] "[T]he right to partition is an incident of a tenancy in common."[57] Ohio Valley and DL share leasehold interests in the wells. We cannot order partition of a lease or of assets; the right to partition applies only to jointly owned property.

## 6. Breach of the December 2000 Agreement and the May 2001 Agreements relating to gas usage and fuel surcharges.

Ohio Valley claims DL breached the December 2000 Agreement (as to the Southern Wells) and the May 2001 Agreements (as to the remaining wells) by overcharging for gas usage and fuel surcharges. As to the May 2001 Agreement, DL argues the gas usage and fuel surcharges are permissible transportation costs or otherwise chargeable under a catch-all provision. DL does not expressly address Ohio Valley's argument DL overcharged under the December 2000 Agreement with respect to the Southern Wells.

13

"Pennsylvania contract law begins with the 'firmly settled' point that 'the intent of the parties to a written contract is contained in the writing itself.'"[58] If the parties' intent is clear, we must rely on the contents of the agreement alone.[59] A contract is unambiguous if we "can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends."[60] If a contract's terms are "ambiguous and susceptible of more than one reasonable interpretation," we may use extrinsic evidence to resolve the ambiguity.[61] The ambiguity must be resolved by the jury.[62]

### *December 2000 Agreement – gas usage and fuel surcharges*

Under the December 2000 Agreement, Ohio Valley must pay DL an operating fee of $150 "in lieu of any direct charges by [DL] for its services or the provisions by [DL] of its equipment required for normal superintendence and maintenance of wells."[63] The operating fee covers "all normal, regularly recurring operating expenses for the production and sale of natural gas, including, without limitation, well-tending, routine maintenance and adjustment, reading meters, recording production, pumping, maintaining appropriate books and records, preparing reports to the Interest Holders and government agencies, and collecting and disbursing revenues."[64]

The December 2000 Agreement unambiguously prohibits charges for gas and fuel, because such charges are subsumed by the operating fee. The operating fee includes, "all normal, regularly recurring operating expenses" for the production and sale of gas "in lieu of *any* direct charges."[65] Gas usage and fuel surcharges are "direct charges" covered by the operating fee. A normal, regularly recurring expense of operating a well includes gas and fuel expenses used to drive and operate vehicles and machinery. The December 2000 Agreement unambiguously permits Ohio Valley to pay $150 monthly per well for all normal operating costs. DL cannot separately invoice Ohio Valley any direct charges for gas and fuel. Because DL

14

directly charged Ohio Valley for gas and fuel, we grant in part Ohio Valley's motion for summary judgment as to Count III to the extent it is based on enforcing the December 2000 Agreement as to the Southern Wells. As Ohio Valley has not identified the amount of gas and fuel charges attributable to the Southern Wells, we reserve the issue of the amount of damages for trial.

### *May 2001 Agreement – gas usage and fuel surcharges*

Although gas usage and fuel surcharges are unambiguously included in operating fee under the December 2000 Agreement, these charges are permissible direct charges under the May 2001 Agreements. Under the May 2001 Agreements, Ohio Valley must pay DL $250 per well per month in "overhead."[66] DL may also charge Ohio Valley for a number of "direct charges."[67] These direct charges are organized into fifteen categories: (1) ecological and environmental; (2) rentals and royalties; (3) labor; (4) employee benefits; (5) material; (6) transportation; (7) services; (8) equipment and facilities furnished by operator; (9) damages and losses to joint property; (10) legal expense; (11) taxes; (12) insurance; (13) abandonment and reclamation; (14) communications; and (15) other expenditures.[68] Transportation charges cover "[t]ransportation of employees and Material necessary for the Joint Operations" with some limitations not applicable here.[69] Because DL might expend fuel to transport employees or material with a vehicle, the May 2001 Agreements unambiguously permit DL to directly charge Ohio Valley for gas usage and fuel surcharges.

Even if the gas and fuel are not directly chargeable as transportation expenses, they are directly chargeable as "other expenditures." Under provision 15, "Other Expenditures" is defined as "[a]ny other expenditure not covered or dealt with in the foregoing provision of this [section] or in [the section governing overhead charges] and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint

15

Operations."[70] Under the section governing "overhead" charges, Ohio Valley must pay DL monthly overhead charges for producing wells, consisting of "compensation for administrative, supervision, office services and warehousing costs."[71] Because Gas and fuel charges do not constitute administrative, supervision, office services and warehousing costs, these charges would be directly chargeable as other expenditures. We deny Ohio Valley's motion for summary judgment as to Count IV to the extent it is based on improper gas usage and fuel surcharges under the May 2001 Agreements, and we grant in part DL's motion for summary judgment as to Count IV to the extent Ohio Valley claims breach of the May 2001 Agreements for overcharging for gas and fuel.

### 7. Unjust enrichment

Ohio Valley argues even if we find DL did not breach the May 2001 Agreements as to fuel and gas charges and the overcharge of monthly operating fees, DL has been unjustly enriched. "By its nature, the doctrine of quasi-contract, or unjust enrichment, is inapplicable where a written or express contract exists."[72] As we held Ohio Valley and DL are bound by the May 2001 Agreements, and those agreements define the parties' obligations as to monthly fees and fuel and gas charges, Ohio Valley cannot pursue claims for unjust enrichment based on gas and fuel charges or overcharge of monthly fees. We deny Ohio Valley's motion for summary judgment as to charges for gas and fuel surcharges in Count VIII and grant DL's motion for summary judgment as to Counts VIII and IX (overcharge of monthly operating fees).

### 8. Breach of the December 2000 Agreement and the May 2001 Agreement based on failure to provide documents.

Ohio Valley claims DL breached both the December 2000 Agreement and the May 2001 Agreement by failing to provide documents as to how DL calculated its fees. DL counters the Ohio Valley failed to follow the procedures outlined in the agreements.

16

Both agreements contain identical provisions regarding access to the Operator's books and records: "Each party . . . shall have access at reasonable times to information pertaining to the development or operation [of the wells], including Operator's books and records relating thereto."[73] The agreements also require the Operator, DL, to furnish certain information upon request: "Operator, upon request, shall furnish each of the other parties with copies of all forms or reports filed with governmental agencies, daily drilling reports, well logs, tank tables, daily gauge and run tickets and reports of stock on hand at the first of each month."[74] While Ohio Valley contends it "repeatedly" sought documentation,[75] DL counters Ohio Valley never properly requested such documentation under the procedures in the agreements.[76]

We find a genuine dispute of material fact as to whether Ohio Valley properly requested documentation under the agreements, and whether DL breached by not providing requested documentation. We deny Ohio Valley's motion for summary judgment as to Count III (breach of December 2000 Agreement as to Southern Wells) and Count IV (breach of May 2001 Agreements as to remaining wells) to the extent they are based on the failure to provide documents.

### 9. The May 2001 Agreements' requirement of gross negligence or willful misconduct only applies to whether DL conducted its operations in a good and workmanlike manner.

DL argues it is entitled to summary judgment on all claims because the May 2001 Agreements limit the operator's liability to liabilities resulting from its gross negligence or willful misconduct. Ohio Valley counters the limitation of liability in the May 2001 Agreements applies only to DL's requirement to operate the wells in a good and workmanlike manner.

The May 2001 Agreements contain an exculpatory clause limiting liability of the operator, DL. The exculpatory clause provides the operator "shall conduct all such operations in

17

a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct."[77]

The Court of Appeals of Texas in *Cone v. Fagadau Energy Corporation* reviewed this same provision and found the gross negligence or willful misconduct requirement only applies to the operator's requirement to conduct operations in a good and workmanlike manner.[78] In *Cone*, the operator argued it could not be liable for breaching the agreement based on overcharging the non-operator because the non-operator failed to allege the operator engaged in gross negligence or willful misconduct.[79] The Court of Appeals rejected this argument, reasoning the language requiring gross negligence or willful misconduct "immediately follows" the language requiring the operator to conduct operations in a good and workmanlike manner, and the operating agreement specifically stated what the operator could charge.[80] The court held "[t]he gross negligence/willful misconduct requirement applies to any and all claims that the operator failed to conduct operations in a good and workmanlike manner."[81] We are persuaded by this reasoning and similarly conclude the gross negligence/willful misconduct requirement only applies to claims DL failed to conduct operations in a good and workmanlike manner.

To the extent Ohio Valley contends DL failed to conduct operations in a good and workmanlike manner, we leave the issue of whether DL's conduct amounted to gross negligence/willful misconduct to the jury. Gross negligence is "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care."[82] The gross negligence determination is normally for the jury, "but may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from

18

doubt and there is no possibility that a reasonable jury could find gross negligence."[83] At this juncture, we lack sufficient information about the Ohio Valley's claims for us to find no possibility a reasonably jury could find gross negligence. We deny DL's motion for summary judgment to the extent DL claims Ohio Valley failed to provide evidence DL engaged in gross negligence or willful misconduct.

## 10. Good faith and fair dealing

DL argues Ohio Valley's claim for good faith and fair dealing fails as a matter of law because (1) Pennsylvania has not recognized an independent covenant of good faith in the context of an oil and gas contract between an operator and a working interest owner; (2) no separate cause of action is permitted based upon an alleged breach of the covenant of good faith; and (3) the covenant cannot be used to circumvent or alter the express terms of the parties' contract.[84] Ohio Valley counters DL violated the covenant of good faith and fair dealing by: (a) not providing information and documents to Ohio Valley; and (b) not expending appropriate resources to pump the wells and doing only the absolute minimum under the Agreements while charging Ohio Valley each month.

"[E]very contract imposes upon the parties a duty of good faith and fair dealing in the performance and enforcement of the contract."[85] "[A] breach of the covenant of good faith and fair dealing is a breach of contract action, not an independent action for breach of a duty of good faith."[86] "Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim."[87]

The covenant of good faith and fair dealing "attaches to existing contractual obligations; it does not add new contractual duties."[88] The covenant imposes a duty which "infuses the

19

parties' performance of their express contractual obligations."[89] While "a complete catalogue of types of bad faith is impossible," bad faith may "include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance."[90]

We agree with DL a breach of the covenant of good faith and fair dealing cannot be plead as an independent claim. We grant DL's motion as to Count VI. Nonetheless, because Ohio Valley pled breach of contract claims, Ohio Valley can rely on those separately pled claims for the bases of its claim DL breached the covenant of good faith and fair dealing. We find a genuine dispute of material fact as to whether DL breached the covenant of good faith and fair dealing. If DL did in fact obtain consent from the lessors of the wells to close the wells but continued to charge Ohio Valley fees and charges as if the wells were producing, this raises a question of fact as to whether DL evaded the spirit of the bargain. Finally, to the extent Ohio Valley seeks relief based on DL's alleged failure to provide documentation, this claim is subsumed by its breach of contract claim.

### 11. Two-year limitation

DL argues it is entitled to summary judgment on all claims to the extent Ohio Valley seeks damages beyond the two-year contractual limitation in the May 2001 Agreements placed upon objections to charges and statements. Ohio Valley counters it could not contest the fees charged because DL withheld documents needed to dispute the charges.[91]

Article I, Section 4 of the Accounting Procedures to the May 2001 Agreements limits the time period for challenging a billed charge or expense where the non-operator fails to lodge a written objection:

> [A]ll bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true

> and correct after twenty-four (24) months following the end of any
> such calendar year, unless within the said twenty-four (24) month
> period a Non-Operator takes written exception thereto and makes
> claim on Operator for adjustment.[92]

There is a genuine dispute of material fact as to whether Ohio Valley lodged written objections to fees or expenses. DL contends the Ohio Valley did not submit any written objections to fees or expenses until January 8, 2014.[93] Current Ohio Valley President Charles Masters swears Ohio Valley "has been making written objections to fees since at least 2003."[94] We deny DL's motion for summary judgment on all claims based on the two-year contractual limitation in light of this genuine dispute of material fact.

## IV. Conclusion

We grant DL's motion for summary judgment as to Counts I, V, VI, VII, VIII, and IX, dismissing Ohio Valley's claims for partition of Warrant 4912, partition based on the May 2001 Agreements, breach of the covenant of good faith and fair dealing, injunctive relief, and unjust enrichment. We grant in part DL's motion for summary judgment as to Count IV (breach of the May 2001 Agreements) to the extent Ohio Valley claims breach of the May 2001 Agreements for overcharging for gas and fuel. We deny DL's motion for summary judgment as to Count II (partition of the Southern Wells).

We also grant in part Ohio Valley's motion for summary judgment as to Count III (breach of the December 2000 Agreement) to the extent it seeks to enforce the December 2000 Agreement as to the Southern Wells. We deny Ohio Valley's motion for summary judgment as to the remaining claims.

---

[1] We amend our November 30, 2016 Memorandum (ECF Doc. No. 114) only to correct inadvertent typographical errors which do not affect either the reasoning for our Order. (ECF Doc. No. 115).

[2] ECF Doc. No. 104, ¶ 1.

[3] ECF Doc. No. 104, ¶ 2.

[4] ECF Doc. No. 107, ¶¶ 8–9; ECF Doc. No. 104, ¶ 14.

[5] ECF Doc. No. 107, ¶ 16.

[6] ECF Doc. No. 107, ¶ 17.

[7] ECF Doc. No. 107, ¶ 16.

[8] ECF Doc. No. 90-5, at p. 1.

[9] ECF Doc. No. 104, ¶ 50.

[10] ECF Doc. No. 90-5, at p. 10.

[11] ECF Doc. No. 90-12, at p. 4.

[12] *Id.*

[13] ECF Doc. No. 90-12, at p. 21 (italics supplied and emphasis omitted).

[14] ECF Doc. No. 95, ¶ 29.

[15] ECF Doc. No. 90-5, at pp. 11–12; ECF Doc. No. 76-4, at p. 12.

[16] ECF Doc. No. 90-5, at p. 12; ECF Doc. No. 76-4, at p. 12.

[17] ECF Doc. No. 90-5, at p. 4.

[18] ECF Doc. No. 90-5, at p. 4.

[19] ECF Doc. No. 90-6, at p. 68.

[20] ECF Doc. No. 90-6, at p. 66.

[21] ECF Doc. No. 90-6, at pp. 67–68.

[22] ECF Doc. No. 107, ¶ 72.

[23] ECF Doc. No. 107, ¶ 63.

[24] ECF Doc. No. 107, ¶ 73.

[25] ECF Doc. No. 107, ¶ 73.

[26] ECF Doc. No. 104, ¶ 76.

[27] ECF Doc. No. 90-6, at p. 65.

[28] ECF Doc. No. 107, ¶ 23.

[29] ECF Doc. No. 107, ¶ 23.

[30] ECF Doc. No. 106, at p. 24.

[31] ECF Doc. No. 107, ¶ 3.

[32] ECF Doc. No. 107, ¶ 4.

[33] ECF Doc. No. 104, ¶ 11.

[34] ECF Doc. No. 76.

[35] ECF Doc. No. 107, ¶ 7.

[36] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

"This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Auto–Owners Ins. Co.*, 835 F.3d at 402 (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)).

[37] *Ruthrauff, Inc. v. Ravin, Inc.*, 914 A.2d 880, 888 (Pa. Super 2006).

[38] ECF Doc. No. 107-1, ¶ 10.

[39] ECF Doc. No. 95, ¶ 35.

[40] *Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 136 (Pa. 1999).

[41] *Ingrassia Const. Co. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. 1984).

[42] *Germantown Sav. Bank v. Talacki*, 657 A.2d 1285, 1289 (1995) (quoting *Petrie v. Haddock*, 119 A.2d 45 (Pa. 1956)).

[43] *Cobaugh v. Klick-Lewis, Inc.*, 561 A.2d 1248, 1250 (Pa. Super. 1989).

[44] *Germantown Sav. Bank,* 657 A.2d at 1289 (quoting *Standard Venetian Blind Co. v. American Emp. Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)).

[45] *Germantown Sav. Bank*, 657 A.2d at 1289–90 (quoting *Provco Leasing Corp. v. Safin*, 402 A.2d 510 (Pa. Super. 1979)).

[46] *In re Estate of Boardman*, 80 A.3d 820, 823 (2013) (quoting *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991)).

[47] ECF Doc. No. 107, ¶ 63.

[48] ECF Doc. No. 105-4, at p. 163–64.

[49] ECF Doc. No. 105-4, at p. 163–64.

[50] ECF Doc. No. 107, ¶ 73.

[51] ECF Doc. No. 107, ¶ 73.

[52] ECF Doc. No. 90-12, at p. 21 (emphasis omitted).

[53] ECF Doc. No. 76-4, at p. 17.

[54] ECF Doc. No. 94-16, at p. 5.

[55] ECF Doc. No. 107, ¶¶ 79–81.

[56] *Bargo v. Kuhns*, 98 A.3d 686, 690 (Pa. Super. 2014) (quoting *Fry v. Stetson*, 87 A.2d 305, 307 (Pa. 1952)).

[57] *Id.* (quoting *Bernstein v. Sherman,* 902 A.2d 1276, 1278 (Pa. Super. 2006)).

[58] *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993)).

[59] *Id.*

[60] *Id.* at 94.

[61] *Id.* at 93.

[62] *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009).

[63] ECF Doc. No. 90-5, at p. 4.

[64] ECF Doc. No. 90-5, at p. 4.

[65] ECF Doc. No. 90-5, at p. 4 (emphasis added).

[66] ECF Doc. No. 90-6, at p. 68.

[67] ECF Doc. No. 90-6, at p. 66.

[68] ECF Doc. No. 90-6, at pp. 67–68.

[69] ECF Doc. No. 90-6, at p. 67.

[70] ECF Doc. No. 90-6, at p. 67.

[71] ECF Doc. No. 90-6, at p. 68.

[72] *Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co.*, 933 A.2d 664, 669 (Pa. Super. 2007) (quoting *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. 2006)).

[73] ECF Doc. No. 90-5, at pp. 11–12; ECF Doc. No. 76-4, at p. 12.

[74] ECF Doc. No. 90-5, at p. 12; ECF Doc. No. 76-4, at p. 12.

[75] ECF Doc. No. 107, ¶ 32.

[76] *Id.*

25

[77] ECF Doc. No. 104, ¶ 76.

[78] *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 155 (Tex. App. 2001).

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1164 (Pa. 1997) (quoting *Bloom v. Dubois Reg'l Med. Ctr.*, 597 A.2d 671, 679 (Pa. Super. 1991)).

[83] *Walsh v. Borczon*, 881 A.2d 1, 9 (Pa. Super. 2005) (quoting *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1165 (Pa. 1997)).

[84] ECF Doc. No. 88, at p. 22.

[85] *Liazis v. Kosta, Inc.*, 618 A.2d 450, 454 (Pa. Super. 1992) (quoting *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 148 (Pa. Super. 1985)).

[86] *Hanaway v. Parkesburg Grp., LP*, 132 A.3d 461, 471 (Pa. Super. 2015) (quoting *LSI Title Agency, Inc. v. Evaluation Servs.,* 951 A.2d 384, 391 (Pa. Super. 2008)).

[87] *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F. Supp. 2d 404, 409 (W.D. Pa. 2011) (citing *LSI Title Agency, Inc. v. Evaluation Services, Inc.*, 951 A.2d 384, 391 (Pa. Super. 2008)).

[88] *Hanaway v. Parkesburg Grp., LP*, 132 A.3d 461, 471–72 (Pa. Super. 2015).

[89] *Id.*, 132 A.3d at 472.

[90] *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992) (quoting Restatement (Second) of Contracts, § 205(d)).

[91] ECF Doc. No. 107, ¶ 32.

[92] ECF Doc. No. 90-6, at p. 65.

[93] ECF Doc. No. 89, ¶ 83.

[94] ECF Doc. No. 90-6, at p. 65.